[Civ. No. 984.   Fifth Dist.   Jan. 16, 1969.]

MYRL P. HOOVER, Plaintiff and Respondent, v. AGRI-FORM CHEMICAL COMPANY, INC., Defendant and Appellant.

Daley, Patridge & Garrett and James M. Garrett for Defendant and Appellant.

James F. Roach for Plaintiff and Respondent.

STONE, J.—Defendant appeals from a judgment in favor of plaintiff in the sum of $11,326. The appeal comes to us on a settled statement, which reflects that:

Growers Agriform Service, Inc. ("Growers") was incorporated March 14, 1956. It engaged in the sale of agricultural chemicals bearing the Agriform label. Respondent Myrl P. Hoover was one of the three original stockholders of Growers and was also one of its principal sources of funds. On February 28, 1957, Growers was indebted to Mr. Hoover on a promissory note, the balance owed being approximately $16,000. Mr. Hoover had become dissatisfied with the management of Growers and wished to withdraw the funds he had loaned to it; it was agreed in writing that Growers would issue a new promissory note to Mr. Hoover in the principal sum of $16,000, payable from Growers' future commissions at the rate of $2 per ton of fertilizer sold. Such payments were to be forwarded "directly" to Mr. Hoover by the distributor, Agriform, the appellant herein.

On March 9, 1957, Growers issued its new promissory note

to Mr. Hoover in the principal amount of $16,000. The new note provided: "Principal and interest shall be payable as follows: When an obligation to Bernhard H. Ehrlich on an equipment conditional sales contract has been fully satisfied under a contract of the company bearing even date herewith, then immediately there shall become due and payable from Growers Agriform Service, Inc. to Myrl P. Hoover a sum calculated at $2.00 per net ton of liquid fertilizer thereafter sold and delivered to customers thereafter in said corporation's sales territory under its agreement with Agriform of Northern California, Inc."

The crux of the case lies in the following addendum implementing the assignment, that was signed by appellant creditor at the time the note was executed: "It is understood that the $2.00 per ton payment mentioned above is to be made to Mr. Hoover by Agriform of Northern California, Inc. and charged to the commission account of Growers Agriform Service, Inc.

/s/ D. W. Galbraith, Pres.
Agriform of No. Calif., Inc.
/s/ Howard C. Goodman, Pres.
Growers Agriform Service, Inc."

Agriform of Northern California, Inc. had been incorporated in 1956 for the purpose of manufacturing and distributing agricultural chemicals of the Agriform label. In 1960 its name was changed to Agriform Chemical Company, Inc. and it was sued in this proceeding under that name.

On March 28, 1957, 19 days after the addendum was signed, Agriform, appellant herein, entered into a new consignment or sales agreement with Growers, respondent's assignor. It was a standard form of consignment agreement similar to the one it superseded, with which respondent, as well as Growers and appellant, was familiar. Paragraph 13 of the new agreement provided in part as follows: "Commissions shall be computed according to schedule A attached hereto. Agriform (Agriform of Northern California, Inc.) shall, at its option, have the right to withhold any commissions, monies or anything of value in its possession belonging to and due consignee (Growers Agriform Service, Inc.), for the purpose of reimbursing itself for any indebtedness due Agriform by consignee at any time." Schedule A, referred to in the agreement, provided that: "Note: $2.00 of commission to be paid direct to Mr. B. H. Ehrlich until his equipment contract is satisfied and upon completion of this payout a like amount to

be paid to Mr. Myrle Hoover to amortize his loan to corporation.''

Growers liquidated the Ehrlich indebtedness on February 2, 1960, and thereafter the following tons of liquid fertilizer were consigned by appellant to Growers, who sold it: 1960— 3,458 tons; 1961—2,308 tons; 1962—1,291 tons. Neither Growers nor Agriform made any payments to Mr. Hoover on account of his note, except $1,800 paid by Growers from the sale of a vehicle.

On February 28, 1957, when the assignment agreement was made, there was a deficit balance of $5,424.46 in Growers' commission account with appellant. The deficit increased gradually, until Growers and appellant ceased to do business in early 1963. The increase in the deficit balance after February 28, 1957, was caused by advances made by appellant to Growers to enable Growers ''to operate'' and ''to keep it afloat.'' Without sales organizations such as Growers, it appears that appellant would have been, and was, unable to operate its Woodland plant.

Respondent had knowledge that at the time the note and assignment agreement were executed Growers was indebted to appellant. The court allowed appellant to offset that deficit against assigned commissions, but advances made after the execution of the assignment and addendum agreement were not allowed as offsets; this, asserts appellant, was error.

Appellant relies primarily upon the case of *Fricker* v. *Uddo & Taormina Co.*, 48 Cal.2d 696 [312 P.2d 1085], for the proposition that advances for use in the assignor's business subsequent to an assignment agreement have priority over the assignment.

While it is true *Fricker* held that certain advances made to a grower after execution of a crop assignment could be set off by the creditor against the assignment, it limited the creditor's priority to advances necessary to produce the crop. The court reasoned that without the advances there would have been no crop and no proceeds. But the doctrine of *Fricker* does not encompass all subsequent advances by the creditor. This is clear from the following language at page 703: ''It should be noted that some of the money advanced for unspecified purposes was used by Kikuchi for living expenses of his family and that some was used to make installment payments due upon farm machinery which he was purchasing. Use of the money for payments on the machinery was probably necessary for production of the crop, but the sums spent for

Kikuchi's family cannot properly be treated as having been used for this purpose. There is no evidence or finding as to how much of the money was used for family support, and, for all that appears, use of advances, for family purposes may explain defendant's failure to prove that all of the advances made by it were necessary for production of the crop.''

Appellant argues that the instant case is brought within the rationale of *Fricker* by the following statement in the ''Engrossed Settled Statement on Appeal'': ''The increase in the deficit balance in Growers' commission account after February 28, 1957 was caused by advances made by the defendant to Growers to enable Growers 'to operate' (testimony of Mr. Hoover) and 'to keep it afloat.' (Testimony of Mr. Galbraith) Without sales organizations such as Growers, it appears that the defendant would have been, and was, unable to operate its Woodland plant.''

But these advances were made for general business purposes; they had no relation to Growers' performance of a specific contract. The settled statement reflects that: ''Mr. Galbraith testified that defendant [appellant herein, of which he was president] paid commission and/or advances to Growers, and it did what it wanted with the money.''

The advances in the case at bench more nearly parallel the advances for family expenses disallowed in *Fricker,* than advances for farm machinery or other items to produce the crop. To utilize the language of the settled statement to frame an analogy, the farmer in *Fricker* was ''kept afloat'' and ''enabled to operate'' by advances for family living. So, here; appellant may have kept Growers afloat by advances, but the advances were used for general purposes, i.e., for any purpose Growers saw fit.

The ratio decidendi of *Fricker* is limited to subsequent advances made to enable the assignor to perform a particular contract which is to produce the funds that were assigned. It does not encompass subsequent advances of a general nature to a going business engaged in many transactions over a period of years, as here, where the assignor sold fertilizer to numerous growers. The Supreme Court plainly said, at page 701: ''The rule that priority must be given to subsequent advances which are necessary to enable the assignor to perform his duties under the contract is obviously an *exception* to the general rule relating to assignments, and, for this reason, the burden was on defendant to put into evidence the

facts required to bring the advances made by it within the exception.'' (Italics added.)

This exception must be strictly construed, else the exception will swallow the rule. Were the exception noted in *Fricker* to become the rule, any assignment of future income could be defeated by the creditor and assignor maintaining the assignor's account at a debit balance.

■ There remains appellant's argument that since respondent was aware of the business relationship between appellant and Growers, which included appellant's practice of making advances to Growers for general business purposes, there was an implied condition attached to the assignment that the $2 per ton payment was conditioned upon a credit balance in Growers' commission account.

The findings recite that there was no such implied condition. The record before us is not entirely one way on this point; it is arguable that the trial court might have drawn the opposite inference, but the one drawn is entirely reasonable. Certainly a reviewing court will not set aside a finding of this character made by the trial judge who heard the witnesses, while the testimony comes to us in summary by way of a settled statement on appeal.

The judgment is affirmed.

Conley, P. J., and Gargano, J., concurred.